Larry W. Gabriel – SBN 68329
Daniel J. Mulligan – SBN 103129
JENKINS, MULLIGAN & GABRIEL, L.L.P.
78-065 Main Street, Suite 202
La Quinta, CA 92253
Telephone: (760) 777-1500
Facsimile: (760) 777-1350

THOMAS J. MCDERMOTT, JR. - SBN 29273
LAW OFFICES OF THOMAS J. MCDERMOTT, JR.
74-770 Highway 111, Suite 201
Indian Wells, CA 92210
Telephone: (760) 779-5800
Facsimile: (760) 779-5882
Email: tmcdermott@mcdelaw.com

Attorneys for David Gould, Chapter 11
Examiner of Centerstaging Musical Corporation, Inc. Debtor

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | CASE NO.: 1:00-bk-15793-GM |
| JAN PAUL PARENT AND KRISTEN SUE PARENT | [Chapter 7] |
| Debtors. | |
| | |
| DAVID GOULD, Court Appointed Examiner, CenterStaging Musical Productions, Inc. | Adv. Proc. No. _____ |
| Plaintiff, | **COMPLAINT (1) TO DETERMINE THAT DEBTOR JAN PAUL PARENT IS NOT ENTITLED TO A DISCHARGE IN BANKRUPTCY PURSUANT TO 11 U.S.C. §727(A) AND (2) SEEKING A DETERMINATION OF NON-DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. § 523(A)(4)** |
| vs. | |
| JAN PAUL PARENT, | |
| Defendant. | |

Plaintiff, David Gould, the duly Court appointed Examiner for the Estate of

CenterStaging Musical Productions, Inc., by and through his attorneys, as and for claims for

1

relief against Jan Paul Parent, the debtor in the above-captioned Chapter 7 case, alleges as follows:

## JURISDICTION AND VENUE

1.      This is an adversary proceeding (the "Adversary Proceeding") to: (a) deny the Debtor's discharge under 11 U.S.C. §727(a) or, in the alternative, (b) determine the dischargeability of the Debtor's debt to Plaintiff, the duly Court appointed Examiner for the Estate of CenterStaging Musical Productions, Inc. under 11 U.S.C. § 523(a) (4).

2.      This Court has jurisdiction over this Adversary Proceeding by virtue of 28 U.S.C. § 157 and 1334 and Bankruptcy Rules 4004, 4007, 7001(4) and 7001(6).

3.      This Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b) (2) (I) and (J), and this Court may enter a final judgment pursuant to 28 U.S.C. § 157(b).

4.      Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409, as this Adversary Proceeding arises under and in connection with a Chapter 7 bankruptcy case styled *In re Jan Paul Parent and Kristen Sue Parent,* Case No.: 1:09-bk-15793-GM (Central District of California, San Fernando Valley Division), filed May 15, 2009, which is pending before this Court.

## PARTIES

5.      Plaintiff, DAVID GOULD ("Plaintiff") is the duly appointed Examiner for the estate of CenterStaging Musical Productions, Inc., ("CMPI") and is authorized to bring the instant action pursuant to the Order of the Court entered on August 8, 2008. Plaintiff brings this action on behalf of the Estate of CMPI and the creditors of the estate of CMPI. CMPI, a California corporation doing business in the County of Los Angeles, State of California filed a voluntary chapter 11 petition bearing case no. 2:08-bk-13109-VZ, in the Los Angeles Division of the Central District of California on March 10, 2008.

6.      Defendant Jan P. Parent ("Parent") is a resident of the County of Los Angeles, State of California. Mr. Parent, at all times relevant was a director and the Chief

2

Financial Officer of CMPI and a director of CenterStageing Corp., a Delaware corporation. ("CSC".) CSC is the parent –holding company of CMPI. (CMPI and CSC are hereinafter referred to collectively as the "Company.")  Parent filed a voluntary petition in this Court (the "Petition") under Chapter 7 of the United States Bankruptcy Code ("Code") on May 15,  2009.

## **FACTUAL BACKGROUND**

7.          The factual underpinnings pertinent to this Complaint are set forth in a complaint the Plaintiff intends to file, subject to obtaining relief from stay, in the CMPI bankruptcy proceedings as an adversary action (the "D&O Adversary Complaint".)[1] A true and correct copy of the D&O Adversary Complaint is attached hereto as Exhibit "A", the factual allegations of which, paragraphs 15 through 50 are expressly incorporated herein by reference as though fully set forth.

## **FIRST CLAIM FOR RELIEF**

### **(Non-Dischargeability of Debt Under 11 U.S.C. §523(a) (4))**

8.          Plaintiff realleges and incorporates herein by reference the allegations set forth above in paragraphs 1 through 7 above, as though the same were fully set forth herein.

9.          In his capacity as a Director of CMPI and the Company,  Parent owed fiduciary duties to CMPI, CMPI's shareholders and CMPI's and the Company's creditors, and imposed upon Parent the responsibility of safeguarding the value of CMPI's assets for the benefit of CMPI's shareholders and CMPI's creditors.

10.          Further, as a director of CMPI, and CSC Parent stood in a position of a trustee for the creditors of the Company.

11.          Parent's failure to appropriately carry out his fiduciary duties, his failure to take any steps to protect the assets of the Company, and his acts in authorizing the Company not to pay its federal and state withholding taxes and in making the preference payments and

---

[1] Concurrently with the filing of this complaint, Plaintiff has filed a motion for relief from stay to pursue the claims presented in the D&O Adversary Complaint (proposed).

1  authorizing fraudulent conveyance transfer as set forth above, resulted in the misappropriation of

2  funds held in his fiduciary capacity.

3         12.       As a result of Parent's actions in his capacity as a controlling shareholder

4  and insider of the Company, Parent's conduct arises from "fraud or defalcation while acting in a

5  fiduciary capacity," within the meaning of 11 U.S.C. § 523(a) (4) and therefore the damages

6  sustained by the CMPI's creditors arising out of or related to the claims presented in the D&O

7  Adversary Complaint should be excepted from discharge.

8         13.       Based upon the foregoing, Plaintiff respectfully requests the Court to enter

9  judgment that the claims presented in the D&O Adversary Complaint and any judgment and or

10  damages awarded from the prosecution of the D&O Adversary Complaint is non-dischargeable

11  under § 523 (a)(4).

12

13                           **SECOND CLAIM FOR RELIEF**

14             **(Denial of Discharge Under Pursuant To 11 U.S.C. § 727(a)(2)(A))**

15         14.       Plaintiff realleges and incorporates herein by reference the allegations set forth

16  above in paragraphs 1 through 13 above, as though the same were fully set forth herein.

17         15.       Parent's actions as described herein were made with the actual intent to hinder,

18  delay, or defraud creditors or officer of the Estate charged with custody of property under this

19  title, and were made within one year of the Petition Date.

20         16.       By reason of the foregoing, the Debtor's discharge should be denied pursuant

21  to Section 727(a)(2)(A).

22

23                            **THIRD CLAIM FOR RELIEF**

24                **(Denial of Discharge Under 11 U.S.C. § 727(a)(3))**

25         17.       Plaintiff realleges and incorporates herein by reference the allegations set forth

26  above in paragraphs 1 through 16 above, as though the same were fully set forth herein.

27

28

4

1    18.    The Debtor has concealed, destroyed, mutilated, falsified or failed to keep or

2  preserve any recorded information, including books, documents, records and papers, from which

3  the Debtor's financial condition or business transactions might be ascertained, and such act or

4  failure to act was not justified under all of the circumstances of the case.

5    19.    By reason of the foregoing, the Debtor's discharge should be denied pursuant

6  to Section 727(a)(3).

7

8                    **FOURTH CLAIM FOR RELIEF**

9                 **(Denial of Discharge Under 11 U.S.C. § 727(a)(5))**

10    20.    Plaintiff realleges and incorporates herein by reference the allegations set forth

11  above in paragraphs 1 through 19 above, as though the same were fully set forth herein.

12    21.    The Debtor has failed to explain satisfactorily, before determination of denial

13  of discharge under Section 727(a), any loss of assets or deficiency of assets to meet the Debtor's

14  liabilities.

15    22.    By reason of the foregoing, the Debtor's discharge should be denied pursuant

16  to Section 727(a)(5).

17

18                      **PRAYER FOR RELIEF**

19    WHEREFORE, Plaintiff prays that judgment be entered in his favor and against Parent as

20  follows:

21    a.    For a determination that Parent is not entitled to discharge under 11 U.S.C.

22  §727(a)(2)(A), (a)(3), and/or (a)(5);

23    b.    In the alternative, for a determination that any judgment or award of damages

24  made against Parent arising out of or related to the allegations contained in the  Adversary

25  Complaint are non-dischargeable under § 523(a)(4).

26    c.    For recovery of Plaintiff's costs and expenses in connection with this

27  adversary proceeding; and

28

1       d.      For such other and further relief against Parent and in favor of the Plaintiff as

2   this Court deems just and proper.

3                              Respectfully Submitted,

4

5   Dated: June 26, 2009               LARRY W. GABRIEL
                                  DANIEL J. MULLIGAN

6                                     JENKINS, MULLIGAN & GABRIEL, L.L.P.

7

8                                   By_____
                                    Larry W. Gabriel

9                                   THOMAS J. MCDERMOTT, JR.
                                LAW OFFICES OF THOMAS J.

10                                  MCDERMOTT, JR.

11                                      Attorneys for David Gould, Chapter 11
                                    Examiner Of Centerstaging Musical

12                                    Corporation, Inc., Debtor

13

14  *136729*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          6

LARRY W. GABRIEL [SBN 68329]
DANIEL J. MULLIGAN [SBN 103129]
THOMAS A. JENKINS [SBN 92213]
JENKINS MULLIGAN & GABRIEL, LLP
78-065 Main Street, Suite 202
La Quinta, CA 92253
Tel: 760-777-1500
Fax 760-564-2915
Email: lgabriel@jmglawoffices.com
Email: dan@jmglawoffices.com

THOMAS J. MCDERMOTT, JR. [SBN 29273]
LAW OFFICES OF THOMAS J. MCDERMOTT, JR.
74-770 Highway 111, Suite 201
Indian Wells, CA 92210
Tel: 760-779-5800
Fax: 760-779-5882
Email: tmcdermott@mcdelaw.com

Attorney for David Gould, Chapter 11 Examiner
CenterStaging Musical Productions, Inc.

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:08-bk-13019-VZ |
| **CENTERSTAGING MUSICAL PRODUCTIONS, INC.** | Chapter 11 |
| Debtor. | **Adv. Case No.** |
| | **COMPLAINT FOR:** |
| DAVID GOULD, Court Appointed Examiner, CenterStaging Musical Productions, Inc. | 1. **BREACH OF FIDUCIARY DUTY - DEEPENDING INSOLVENCY;** |
| Plaintiff, | 2. **BREACH OF FIDUCIARY DUTY – CORPORATE WASTE AND MISMANAGMENT;** |
| vs. | 3. **DECLARATORY RELIEF;** |
| JOHN G. CASWELL, a/k/a Johnny Caswell, an individual, JAN P. PARENT, an individual, HOWARD LIVINGSTON, an individual, ROGER B. PAGLIA, an individual, PAUL SCHMIDMAN, an individual, | 4. **TO AVOID AND RECOVER PREFERENTIAL TRANSFERS** |
| | 5. **TO AVOID AND RECOVER FRAUDULENT CONVEYANCES** |
| Defendants. | **DEMAND FOR JURY** |

**EXHIBIT A**

1   Plaintiff, David Gould, the duly Court appointed Examiner for the Estate of

2   CenterStaging Musical Productions, Inc., by and through his attorneys, as and for claims for

3   relief, alleges as follows: [1]

## INTRODUCTION

5   1.   This is an action brought by the Plaintiff on behalf of the Estate of CenterStaging

6   Musical Productions, Inc. and the creditors of CenterStaging Musical Productions, Inc. ("CMPI"

7   or the "Estate" or the "Debtor") against CMPI's officers and directors (collectively the

8   "Defendants") who over the last 4 years grossly mismanaged CMPI in violation of their fiduciary

9   duties and obligations owed to the Estate and the creditors of the CMPI.

10   As presented below since 2005, Defendants failed to conduct CMPI's business in a

11   reasonable and prudent fashion at a time when CMPI was operating within the zone of deepening

12   insolvency.   In particular, Defendants attempted to execute an unrealistic business plan for

13   CMPI's "rehearsals.com" division that was dependent upon securing proper recording artist

14   agreements with prominent recording artists, that Defendants failed to obtain before spending

15   millions of dollars in a corporate restructuring and in start up costs for production equipment and

16   facilities, thus depleting the Debtor's capital and restricting the Debtor's ability to produce and

17   market the video content generated by CMPI's "rehearsals.com" division.

18   Moreover, even after recognizing the impracticality if not impossibility of the

19   "rehearsals.com" business model, and knowing that their access to additional capital was

20   severely restricted or non-existent and during the time CMPI was within the zone of deepening

21   insolvency, Defendants continued to operate the business for their own personal benefit and to

22   the detriment of the CMPI and its creditors.   Among other thing, the Defendants paid themselves

23   excessive salaries, benefits and stock options, made preference transfers to themselves in

24   repayment of "loans" (capital) Defendants had made to the Debtor, and engaged in fraudulent

25   ///

26

27   [1] The claims presented are those for injuries that are common to all creditors. Such claims are properly brought
through the debtor corporation. Upon the filing of a bankruptcy petition, general claims held by the debtor's
28   creditors become property of the bankruptcy estate. *See* 11 U.S.C. § 541. Section 544(b) of the Bankruptcy Code
grants only trustees or debtors-in-possession standing to pursue general claims held by the debtor's creditors. *PHP Liquidating, LLC v. Robbins,* 291 B.R. 592, 599 (D.Del.2003).  As defined in the order, the Examiner is afforded the
powers of a trustee for purposed of bringing this action.

1    conveyance transactions for their own personal benefit, all the while incurring additional debt
2    obligations that had no realistic chance of being repaid.

3        In March 2007 CMPI reached a crossroads. It was out of cash, and its ability to raise
4    sufficient capital to operate CMPI and move forward in the implementation of "rehearsals.com"
5    was severely limited.    The Defendants were faced with the ultimate business decision – to
6    continue to attempt to operate the business on a shoestring, without adequate capital or funding
7    sources in an effort to protect their future interests, or act in the best interests of CMPI's creditors
8    by using CMPI's available assets to protect its creditors without further increasing CMPI's debt
9    obligations. The Defendants decision was to disregard their fiduciary obligation to the creditors,
10   refusing to abandon the "rehearsals.com" business, and instead of preserving CMPI's assets,
11   deciding to continue business operations by not paying federal and state employment
12   withholding taxes, using the tax money to operate CMPI's business, including making
13   compensation and preference payments to themselves.    In so doing Defendants managed to
14   extend CMPI's life for one year – during which time Defendants continued to pile new debt upon
15   CMPI while failing to raise the capital needed to continue its business operations and exploit its
16   "rehearsals.com" division.    In the process the Defendants increased CMPI's corporate debt by
17   approximately $13 million, including over $1.2 million tax liabilities to the Federal and State
18   Governments, lost the opportunity to sell CMPI's "video library" at a fair value, and lost the
19   ability to sell the corporation as an ongoing entity; all of which left CMPI in substantially worse
20   financial condition than they would have been had the Defendants appropriately exercised their
21   fiduciary obligations to CMPI's creditors.

22        In summary, at least from January 2007 thru March 10, 2008, the Defendants engaged in
23   a course of conduct that plunged CMPI deeper and deeper into insolvency, and engaged in
24   tortuous conduct without regard to and in breach of their fiduciary obligations owed to the
25   creditors of the CMPI. As a result of the acts and conduct of the Defendants, the CMPI's
26   creditors have suffered losses in excess of $ 13 million.[2]

27

28   _____
[2]/ See e.g. *Smith v. Arthur Anderson, LLP* (In re Boston Chicken) 421 F.3d 989 (9th Cir.2005) ("Prolonging an
insolvent corporation's life through bad debt may . . . cause the dissipation of corporate assets. This harm can be
averted, and the value within an insolvent corporation salvaged, if the corporation is dissolved in a timely manner,
rather than kept afloat with spurious debt").    9

**JURISDICTION AND VENUE**

2. This action is a civil proceeding related to a case under Title 11 of the United States Code. This Court has jurisdiction over this matter, including but not limited to, jurisdiction pursuant to 28 U.S.C. § 1334.

3. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, as well as the Local Bankruptcy rules of the United States Bankruptcy Court and the United States District Court for the Central District of California.

4. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b) (2) (A), (B) and (O).

5. Venue is proper in this Court, including venue pursuant to 28 U.S.C. §§ 1408 and 1409, because, among other things, this is the district in which the bankruptcy action is pending.

6. Pursuant to 28 U.S.C. § 1391, venue is appropriate in this Central District of California as Defendants are authorized to and regularly carry out substantial business in this district and the acts and conduct complained of herein took place within this district. Accordingly, this Court also has personal jurisdiction over the Defendants.

**THE PARTIES**

A. **PLAINTIFF**

7. Plaintiff, DAVID GOULD ("Plaintiff") is the duly appointed court appointed Examiner for the estate of CMPI, and is authorized to bring the instant action pursuant to the Order of the Court entered on August 8, 2008. Plaintiff brings this action on behalf of the Estate and the creditors of the estate of CMPI. CMPI, a California corporation doing business in the County of Los Angeles, State of California filed a voluntary chapter 11 petition bearing Case No. 2:08-bk-13109-VZ, in the Los Angeles Division of the Central District of California on March 10, 2008.

///

///

///

## B. **DEFENDANTS AND RELATED AND AFFILIATED ENTITIES**

8.     CenterStaging Corporation ("CSC") is a Delaware corporation with its principal place of business in the County of Los Angeles, State of California. CSC is the parent corporation and sole shareholder of CMPI.

9.     Defendant John G. Caswell a/k/a Johnny Caswell ("Caswell") is a resident of the County of Los Angeles, State of California. Mr. Caswell was at all times relevant and now is a director and chairman of the board of CMPI and CSC, and CMPI's Chief Executive Officer. Mr. Caswell is an insider of the Debtor under 11 U.S.C. § 101(31).

10.     Defendant Jan P. Parent ("Parent") is a resident of the County of Los Angeles, State of California. Mr. Parent was at all times relevant and now is a director and Senior Executive Vice President of CMPI and a director of CSC. On or about May 15, 2009, Mr. Parent filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (Case No. 1:09-bk-15793-GM). Mr. Parent is an insider of the Debtor under 11 U.S.C. § 101(31).

11.     Defendant Howard Livingston ("Livingston") is a resident of the County of Los Angeles, State of California. Mr. Livingston, at all times relevant, was a director and the Chief Financial Officer of CMPI and a director of CSC. On October 7, 2008, Mr. Livingston filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (Case No. 1:08-bk-17784-GM). Mr. Livingston is an insider of the Debtor under 11 U.S.C. § 101(31).

12.     Defendant Roger B. Paglia ("Paglia") is a resident of the County of Los Angeles, State of California. Mr. Paglia, at all times relevant, was a director and Chief Executive Officer of CMPI and a director of CSC. On October 14, 2008, Mr. Paglia filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (Case No. 1:08-bk-17973-GM). Mr. Paglia is an insider of the Debtor under 11 U.S.C. § 101(31).

1       13.    Defendant Paul Schmidman ("Schmidman") at all times relevant was a resident of

2 the County of Los Angeles, State of California and was the President and Chief Operating

3 Officer of CMPI, having joined CMPI in July 2006. Mr. Schmidman was an insider of the

4 Debtor under 11 U.S.C. § 101(3).[3]

5
**AGENCY**

6       14.    At all times herein mentioned, Defendants, and each of them, were agents or joint

7 venturers of each of the other defendants and, in doing the acts alleged herein, were acting within

8 the course and scope of such agency. Each defendant had actual and/or constructive knowledge

9 of the acts of each of the other defendants and ratified, approved and/or retained the benefits of

10 said wrongful acts.

11
**FACTS COMMON TO ALL CLAIMS FOR RELIEF**

12
**A.**   **CMPI'S BUSINESS OPERATIONS**

13       15.    In or around 1990 Caswell and Parent started CMPI incorporating the business

14 (California) in 1993. Initially, CMPI's business consisted of musical equipment rental. As CMPI

15 accumulated an inventory of musical equipment, it leased a warehouse in Burbank, California, to

16 store the equipment, and then leased adjoining property to construct several professional music

17 studios to rent to musicians for rehearsal and recording purposes. As the business expanded,

18 CMPI provided production support and services for televised musical performances on television

19 award shows and for many popular musical performers and personalities. These services

20 included renting the musical equipment for the musicians performing during the award show,

21 renting studios as rehearsal space for musicians, and providing on-set expertise in preparing and

22 staging the musical numbers during the shows.

23       16.    CMPI maintains and operates one soundstage and eleven (11) rehearsal or

24 recording studios at CenterStaging Burbank, and one studio at CenterStaging East in

25 Pennsylvania.[4] CMPI rents its soundstage and studios for periods ranging from one day to

26
[3]/ Mr. Schmidman died on June 15, 2009. Plaintiff will be filing a claim in the Estate of Paul Schmidman when the
27 same has been established.

28
[4]/ CMPI's principal facility is located near the Bob Hope Airport in Burbank, California. The 150,000 square foot facility is comprised of CMPI's executive and administrative offices, warehouse space for its inventory of musical instruments and equipment, one soundstage, eleven studios, editing rooms and a state of the art broadcast center. It

12

several months or longer. In addition, CMPI maintains an inventory of over 10,000 musical instruments and related items that are available for rent to professional musicians and recording artists using CMPI's studios and rehearsal space.

### B. THE "REHEARSALS.COM" DIVISION

17. In 2004 Defendants Caswell and Parent decided to attempt to monetize the rehearsals that were taking place at CMPI, by recording the rehearsals of the performers who were leasing the CMPI studios and equipment. This original digital content was to provide a behind-the-scenes perspective of recording artists, capturing candid, unscripted interactions among those artists and the music they play. Caswell and Parent (CMPI) intended to distribute this original content worldwide, primarily through third party distribution channels, such as the Internet, television, cable providers, video, DVD, and pay-per-view. In order to implement this concept Caswell and Parent created the "rehearsals.com" division of CMPI.

18. On April 1, 2004 Caswell and Parent authorized and approved agreements between CMPI and Mr. Livingston and Mr. Paglia to assist them with the formulation and implementation of a business plan for the exploitation of the "rehearsals.com" division. Thereafter Mr. Livingston assumed the role of CMPI's Chief Financial Officer and Mr. Paglia became CMPI's Chief Executive Officer. Both Mr. Livingston and Mr. Paglia became members of the board of directors of CMPI and CSC.

19. Plaintiff is informed and believe and based thereon alleges that between April 2004 and August 2005, Caswell, Parent, Livingston and Paglia developed the concept of exploiting the "rehearsals.com" business by taking CMPI "public", and then using the publicly traded company as a vehicle for raising the funding CMPI would need during the start up period

is also the location for rehearsals.com. The Company leases this facility under three leases. One lease expired June 30, 2008, and provided for monthly rent of $41,961. The second lease expired January 3, 2009, and provided for monthly rent of $14,260 with a 3% increase each February for the term of the agreement. The leases have been renewed. The third lease for the Burbank facility is with Jan & Johnny, Inc. a Variable Interest Entity owned by John Caswell and Jan Parent and expires June 30, 2008 with an option to extend the lease an additional five years (until June 30, 2013). This third Burbank lease provides for monthly payments of $34,729 with a 5% escalation clause each year through June 30, 2008. The lease was extended. Jan & Johnny Inc. filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, (Case No. LA 2:08-bk-18277-VZ.)

13

of "rehearsals.com." This "vehicle" would also provide Caswell, Parent, Livingston, and Paglia their "exit strategy" from the company, to wit: selling their stock in CMPI to third party investors.

### C. CMPI'S EMERGENCE AS A PUBLIC ENTITY

20.     On August 17, 2005, Caswell, Parent, Livingston, and Paglia in furtherance of their business plan for CMPI and "rehearsals.com" orchestrated a reverse triangular merger whereby Knight Fuller, Inc. a Delaware corporation ("Knight Fuller") acquired all the outstanding shares of CMPI, in exchange for 42,480,000 restricted shares of its common stock. (the "Merger"). The acquisition was accounted for as a reverse merger (recapitalization) with CMPI deemed to be the accounting acquirer. Knight Fuller then changed its name to CenterStaging Corp. ("CSC.") [5] As a result of the transaction CSC (a Delaware corporation) became a publicly traded company, with CMPI its wholly owned subsidiary (hereinafter collectively referred to as the "Company.") CSC has limited or no assets other than the stock of CMPI. The two entities have a consolidated financial statement and from August 2005 to March 10, 2008, had the same officers and directors, Caswell, Parent, Livingston, and Paglia, with no outside or independent directors on either the board of CMPI or CSC.

21.     The cost of the merger was significant. During the three months ended September 30, 2005, the Company experienced net losses of $11,676,044 as compared to a net loss of $571,073 for the three months ended September 30, 2004. Moreover, as of September 30, 2005, the Company incurred substantial monetary liabilities in excess of monetary assets accumulating a deficit of $19,213,921.  The principal cause for the deficit is attributable to the corporate restructuring and the rollout of the "rehearsals.com" division.

---

[5] A reverse triangular merger is often the structure of choice where the parties desire that none of the target's assets be transferred. In a reverse triangular merger, a subsidiary of the acquiring corporation merges with the target, the stock of the subsidiary is converted into the stock of the target, and former shareholders of the target receive the merger consideration in return for their target stock. As a result of the merger, the target becomes a wholly owned subsidiary of the acquirer. A reverse triangular merger generally requires fewer consents from third parties to agreements because, absent a provision that specifically prohibits assignment in a reverse triangular merger, this type of merger generally does not trigger anti-assignment clauses.  As a result of this transaction, CSC. (a Delaware Corporation) became a publicly traded company, And CMPI its wholly owned subsidiary.

**D.  THE COMPANY'S POST MERGER HIRINGS, BUSINESS**
**OPERATIONS, AND FINANCIAL RESULTS FROM OPERATIONS**

22.  During 2005–2006 the Company dramatically increased the salaries of its officers and employees, incurring additional substantial costs in the continuing roll out of the "rehearsals.com" division. Salaries and wages increased from $482,000 for the quarter ended September 30, 2004 to $1.2 million for the quarter ended September 30, 2005 during which time CMPI: increased the number of its employees by 50% (including twelve employees hired solely for the "rehearsals.com division); entered into new employment agreements with its executive officers, increasing salaries and bonuses, and significantly increased the salary earned by the production staff of the "rehearsals.com" division.

23.  As of September 30, 2005 CMPI had greatly increased its selling, general and administrative expenses from $461,000 for the quarter ended September 30, 2004 to $3.7 million for the quarter ended September 30, 2005. This was primarily due to: (i)) a $2.4 million increase in consulting expenses; (ii) a $217,000 increase in depreciation and amortization expense; and (iii) a $192,000 increase in costs of legal and accounting services. The increase in consulting expense was principally due to the $2.3 million expense associated with the issuance of 2,480,000 shares of common stock to consultants during the quarter in connection with the Merger. The increased depreciation and amortization expense was primarily attributable to CMPI's procurement of broadcast related equipment, and leasehold improvements to CMPI's broadcast center and studios, all of which were related to the "rehearsals.com." division.  The increased legal and accounting costs were attributable to costs associated with completing the acquisition of CSC and related transactions, and the audit of CSC's financial statements.

24.  As of September 2005 the Company had sufficient working capital only to cover its anticipated operating costs and expenses through the next several months, and recognized that it would not receive material revenues from its "rehearsals.com" division prior to the fourth quarter of fiscal 2006.  By the end of 2005 the Company had spent millions of dollars for the build-out of its broadcast center and in the acquisition of broadcast equipment for "rehearals.com" notwithstanding that Defendants Caswell, Parent, Livingston, and Paglia knew

15

that the Company would need additional capital or financings in order to provide a sound financial base for the Company's business operations. They also knew that it was unlikely the Company would be able to obtain material commercial bank financing, as all of CMPI's assets were subject to security interests to secure borrowings from existing lenders. Caswell, Parent, Livingston, and Paglia further knew that if the Company could not obtain sufficient additional financing during the 2005-2006 fiscal years; the Company would be forced to slow down or suspend its business operations for the "rehearsals.com" division.

25.     During this period of time (2005-2006) the Company, and its officers and directors, Defendants Caswell, Parent, Livingston, and Paglia, and each of them, recognized that the success of the "rehearsals.com" division was dependent upon a number of factors, including but not limited to: (1) the consent and collaboration of musical artists, record labels, and talent managers, all or some of which may not be available on commercially reasonable terms or at all; (2) on various relationships with musical artists, record labels, and talent managers for services and product; and (3) agreements with recording artists, record labels and talent managers that would permit the Company's publication and distribution of the performances or likenesses of the artists (the "artist consents.") Thus Defendants Caswell, Parent, Livingston, and Paglia knew that without the artist consents and cooperation CMPI could not exploit the "rehearsals.com" library.

26.     Notwithstanding the foregoing, Defendants Caswell, Parent, Livingston, and Paglia authorized the expenditure of millions of dollars building "state of the art" performance and recording studios without any assurances that significant performing artists would timely consent to the release of their recorded rehearsals and music, and without fully investigating the marketability of the product they intended to produce through "rehearsals.com."

27.     The Company launched its "rehearsals.com" website in March 2006 notwithstanding that it had insufficient marketable content to support the website.

28.     On or about June 11, 2006 Caswell, Parent, Livingston and Paglia approved the employment of Paul Schmidman as a Vice President – Chief Operating Officer providing Mr.

///

16

Schmidman with a base salary of $300,000, and options to purchase 37,500 shares of CSC. Mr. Schmidman was appointed President of the Company in or about February 6, 2007.

29. The Company experienced net losses of $25,298,931 for the fiscal year ended June 30, 2006.

30. On or about July 1, 2006, the Company entered into "Revolving Line of Credit Agreements" ("LOCs") with Defendants Parent, Paglia, Livingston, and Caswell. Pursuant to the terms of the LOCs each of the Defendants agreed to provide advances to the Company in amounts up to $250,000.00, later amended to $500,000.00. A true and correct copy of an exemplar of the LOC is attached as Exhibit "1." The LOC for each defendant is identical as to the terms and conditions.

31. By the end 2006, the Company lacked necessary cash flow to support operations and additional financings were becoming harder to come by. As of January 10, 2007, CMPI (and the Company) had approximately $10.1 million of secured and unsecured indebtedness, which included loans from affiliates (i.e. related parties) in the amount of $1,439,000, of which $1,263,000 was payable upon demand, $101,000 was due May 2007, and $75,000 due July 2010.

32. In or around March 2007 the Company had depleted its cash resources and was unable to raise cash from outside sources. In order to continue operations in March 2007, Defendants Caswell, Parent, Livingston, Paglia and Schmidman made a conscious decision to stop paying state and federal payroll taxes, apparently in order to provide cash flow for Company operations.

33. On March 13, 2007, the Company approved an agreement with Montage Partners III ("Montage") to, among other things, pay Montage a loan extension fee of $50,000, issue Montage 75,000 shares of Common Stock and amend and restate a Securities Purchase Agreement dated December 12, 2005 (the "Debenture") between the Company and Montage in exchange for Montage's forbearance from issuing a default of the Debenture.

34. On March 21, 2007, Defendants Paglia, Livingston, Parent and Caswell, as members of the board of directors of the Company approved the following transactions:

///

17

a. The issuance of 25,000 share of CSC to Robert Philpott in consideration for a loan to CMPI in the amount of $250,000;

b. An agreement with Bruce Ryan Production Design, Inc., to satisfy its invoice to CMPI in the amount of $30,001.50 for production and design services in exchange for 20,001 shares of Common Stock in CSC;

c. An agreement with Newmagic Entertainment, Inc. to satisfy its invoice to CMPI in the amount of $30,000 for software programming services of broadcasting equipments in exchange for 20,000 share of Common Stock in CSC;

d. An agreement with PMB & Co. to satisfy its invoice to the Company for $28,500 for accounting services rendered to the Company in exchange for 19,000 shares of Common Stock in the Company.

35. On March 26, 2007, the Company borrowed $1,600,000 from John Fife. The loan is evidenced by that certain Series 2007 Secured Original Issue Discount Note Due On Or Prior To March 26, 2008 (the "Discount Note") and, is secured by the personal guaranties of Paglia, Livingston, Parent and Caswell, who pledged 13,500,000 shares of their common stock in the Company to secure performance of the of their obligations under the Discount Note and personal guaranties. The Discount Note could be paid on any of three maturity dates. The Company was obligated to pay $2,000,000 if the Discount Note was paid on or prior to September 26, 2007, $2,133,333 if the Discount Note was paid after September 26, 2007, but on or prior to December 26, 2007, and $2,400,024 if the Discount Note is paid after December 26, 2007, but on or prior to March 26, 2008.

36. In or around April 2007, the Defendants formulated a last ditch effort for the continuing operations of CMPI, a true and correct copy of which is attached hereto as Exhibit "2", an effort which obviously could not be accomplished as the Company was insolvent beyond reclamation. Not disclosed is the decision by the Defendants to forego paying federal and state withholdings taxes as part of their "financing" of the Company's business.

///

///

18

37.     On July 16, 2007 Paglia, Livingston, Parent and Caswell, as members of the board of directors of the Company approved a consulting agreement between the Company and Andrade Architects, Inc. (Laguna Beach California) pursuant to which the Company agreed to pay Andrade Architects $255,000.00.

38.     In or around July/August 2007, the Company entered into negotiations with Credit Suisse for a $12 million credit facility - $ 6 million loan and $ 6 million equity position. As part of the negotiations the Company arranged for an independent valuation of the "rehearsals.com" library by Houlihan Lokey ("HL.") HL appraised the value of the library as being between $10-16 million based upon approximately 4,000 hours of video content. The valuation is based upon an assumption that the library was fully exploitable and that all appropriate releases and / or agreements had been reached with the recorded artists.

39.     In August 2007, Credit Suisse terminated its negotiations regarding the previously mentioned proposed financing transaction. At or about this time, Credit Suisse offered to provide the Company with $ 6 million in debt financings, subject to the Company raising another $ 6 million in equity. The Company was unable to act upon this proposal.

40.     The Company experienced net losses of $17,777,913 for the fiscal years ending June 30, 2007. During the three months ended September 30, 2007 the Company experienced additional net losses of $4,473,599. In addition, the Company had substantial monetary liabilities in excess of monetary assets and, as of September 30, 2007, had an accumulated deficit of $55,088,173 and a total stockholders' deficit of $15,797,196. As a result, Defendants Caswell, Parent, Livingston, Paglia and Schmidman and each of them knew that these matters, among others, raised substantial doubt about the Company's ability to continue as a going concern. Moreover at or about this time, Defendants Caswell, Parent, Livingston , Paglia and Schmidman, and each of them knew that the Company's ability to obtain additional financing in the coming months was dependent upon a number of factors, including market conditions, results of operations, success in implementing its business plan for "rehersals.com" and investors'

///

///

1  perceptions of the Company's business and prospects. Indeed, at this time, the Defendants knew
2  that no additional financings would be forthcoming.

3      41.    In 2007-2008 the Company planned to generate revenues from "rehearsals.com"
4  through the distribution and licensing of high-definition audio/video content and through
5  sponsorships on its "rehearsals.com" website. However by September 30, 2007, the Company
6  had only 85 hours of content available for internet use as the company had failed to obtain the
7  artist consents necessary to exploit the hundreds of hours of video content it had generated
8  during 2005-2007.

9      42.    Since the start-up of rehearsals.com in fiscal year 2004, the Company had a
10  working capital deficiency as its cash requirements exceeded cash flows from operations. The
11  Company incurred expenses of approximately $6.8 million in fiscal year 2007 and $2.5 million
12  in the three months ended September 30, 2007, in connection with "rehearsals.com." These
13  expenses were due largely to compensation expense, acquisitions of assets, and production and
14  production support in connection with the start-up of "rehearsals.com" and the creation of digital
15  content. Through September 30, 2007, the Company had not generated a material amount of
16  revenues from this division.

17      43.    As of September 30, 2007, the Company had approximately $900,000 of principal
18  indebtedness due on demand, and approximately $7.4 million due on or before September 30,
19  2008. Of these amounts, $934,000 was due to directors and principal shareholders.

20      **E.    CMPI'S BOARD OF DIRECTORS CONTROL AND INSIDER**
21          **FINANCIAL TRANSACTIONS**

22      44.    Defendants Caswell, Parent, Paglia, and Livingston owned beneficially 60% of
23  the Company's outstanding Common Stock. Prior to CMPI's bankruptcy these same individuals
24  constituted the Board of Directors of CMPI and CSC. There were no independent directors on
25  either of the Boards.

26      45.    As set forth in paragraph 30 above, as of July 1, 2006, the Company had entered
27  into separate revolving line of credit agreements with each of the following Defendant Directors
28  and/or officers: John G. Caswell, Howard Livingston, Roger B. Paglia, and Jan Parent. Under the

20

terms of the LOCs, each of these individuals could, in their sole and absolute discretion, advance funds to the Company on a revolving basis to meet the Company's short-term working capital needs as may be requested from time to time. The total principal amount of all advances outstanding (as amended) at any time under each credit agreement was limited to $500,000. Any advances were to bear interest at a variable rate equal to the prime rate plus 4%. The amount advanced and interest was due and payable on demand.

46.     Between July 1, 2006 and March 10, 2008 Caswell, Parent, Livingston and Paglia made advances to the Company and received the payments as set forth on the schedules of short term and long term debt, attached hereto as Exhibits "3" and "4", which schedules are incorporated herein by reference as though fully set forth.

47.     Between 2005 and March 10, 2008, Caswell, Parent, Paglia and Livingston each received at least the following amounts as and for their compensation at a time when the Company was operating in the zone of insolvency and was undercapitalized and was incurring substantial debt without the likelihood or ability of the Company to generate sufficient cash flow from operations to sustain its business operations:

| Year | Caswell | Parent | Livingston | Paglia |
|------|---------|--------|------------|--------|
| 2005 | $ 418,037 | $ 418,037 | NA | NA |
| 2006 | $ 467,500 | $ 467,500 | $ 347,905 | $ 349,779.59 |
| 2007 | $ 307,015.16 | $ 276,817.28 | $ 265,819.36 | $ 265,819.36 |

48.     Caswell, Parent, Paglia, and Livingston authorized the Company to enter into lease agreements with Jan & Johnny Inc. for one of the studios at the Burbank facility. The lease is accounted for as a Variable Interest Entity in the Company's consolidated financial statements

1    and provided for monthly payments of $34,729 with a 5% escalation clause each year through

2    June 30, 2008. Upon information and belief, the lease exceeded the fair market value for a lease

3    of comparable premises.

4         49.    Caswell, Parent, Paglia, and Livingston authorized the Company to advance

5    money to an entity in which Caswell had an interest, regarding the potential construction of a

6    soundstage/rehearsal facility in Las Vegas. Upon information and belief the debt was guaranteed

7    by Caswell and when the entity did not repay, neither did Caswell, and CMPI accepted certain

8    property in lieu of payment. The value of this property is substantially less than the full debt

9    amount. The debts associated with this separate venture have been assumed by the Company.

10    **F.    CMPI BANKRUPTCY FILING AND THE AMOUNT OF INCREASED**

11    **DEBT BETWEEN JANUARY 2007 AND THE DATE OF FILING.**

12         50.    On March 10, 2008 CMPI filed for Chapter 11 bankruptcy. Pursuant to the

13    Claims Register Summary submitted as part of the bankruptcy filing, as of the date of filing,

14    CMPI had secured debt of $ 9,655,120.65, unsecured debt of $ 9,361,990.06, priority claims of

15    $ 1,285,419.51, and "unknown" claims of $3,696,099.36. The total listed indebtedness as of the

16    date of filing: $ 23,998,629.96, as compared to a total debt as of January 10, 2007 of $10.1

17    million.

                      **CLAIMS FOR RELIEF**

18

                     **FIRST CLAIM FOR RELIEF**

19

         **(BREACH OF FIDICUARY DUTY – DEEPENING INSOLVENCY**
20          **AGAINST DEFENDANTS CASWELL, PARENT,**
         **LIVINGSTON, PAGLIA, AND SCHMIDMAN)**
21

        51.    Plaintiff realleges and incorporates herein by reference the allegations set forth
22

above in paragraphs 1 through 50 above, as though the same were fully set forth herein.
23

        52.    According to the Company's Quarterly Report Pursuant to Section 13 or 15(D) of
24

the Securities Exchange Act of 1934 for the quarterly period ended December 31, 2006, filed
25

with the Securities & Exchange Commission on February 14, 2007: "During the six months
26

ended December 31, 2006 and 2005, the Company had experienced net losses of $7,799,313 and
27

28

$14,364,931, respectively. In addition, the Company incurred substantial monetary liabilities in excess of monetary assets over the past several years and, as of December 31, 2006, had an accumulated deficit of $40,636,121 and a total stockholders' deficit of $9,653,364. These matters, among others, raised substantial doubt about its ability to continue as a going concern."

53.    The Company's conclusion that its financial condition as set forth in paragraph 52 above raised substantial doubt about its ability to continue as a going concern, placed the Company in the zone of "deepening insolvency" as of January 2007. As a result thereof, Defendants Caswell, Parent, Livingston Paglia and Schmidman, as officers and directors of CMPI, and each of them, owed a fiduciary duty to the Company, its shareholders and its creditors.

54.    The Defendants Caswell, Parent, Livingston, Paglia and Schmidman, allowed CMPI and/or CenterStaging to incur excessive, or as the case may be purported additional debt between January 2007 through March 10, 2008 in excess of $13 million during which time the Company was operating in the zone of deepening insolvency, knowing that revenues and potential revenues from operations were insufficient and would continue to be insufficient to service this debt or repay the same in the ordinary course of business, knowing that their business plan could not be implemented and knowing that adequate additional funding sources needed to implement the business plan were not available.

55.    By engaging in the conduct described above, thereby artificially extending the life of the Company so that each of the Defendants could exploit the Debtor for their own purposes, Defendants caused the Company to expand greatly its corporate debt to levels it could not sustain or repay. This deepening insolvency, was masked from the Company's creditors and the general public as the Defendants failed to disclose the true financial condition of the Company, including their failure to pay federal and state withholding taxes, to those who continued to render goods, services and credit to the Company in reliance on the representations and statements made by the Defendants as to the Company's financial condition, business plan and potential for profits arising therefrom.

23

56.     Had the Debtor's creditors been aware of the Company's true financial situation (and had independent management of the Company existed at the time) the creditors and independent management would not have permitted the Company to continue increasing the Debtor's liabilities and/or to deepen the Debtor's insolvency.

57.     While this expansion of debt described above artificially prolonged the Company's corporate life for some period of time, ultimately the actions of Defendants forced CMPI to seek bankruptcy protection.

58.     The Defendants wrongful conduct and their breach of their fiduciary duty to the Company and its creditors as hereinabove alleged caused the financial demise of CMPI and/or deepened the Debtor's insolvency to the detriment of The Estate and its creditors.

59.     By reason of the foregoing, Defendants Caswell, Parent, Livingston, Paglia, and Schmidman have caused damages to the Company and the creditors of the CMPI in an amount as yet undetermined but in no event less than $13,000,000.

## SECOND CLAIM FOR RELIEF

### (BREACH OF FIDICUARY DUTY – ERRORS AND OMISSIONS – CORPORATE WASTE - IN THE MANAGEMENT AND OPERATIONS OF THE COMPANY AGAINST DEFENDANTS CASWELL, PARENT, LIVINGSTON, PAGLIA, AND SCHMIDMAN)

60.     Plaintiff realleges and incorporates herein by reference the allegations set forth above in paragraphs 1 through 59 above, as though the same were fully set forth herein.

61.     In doing the acts hereinabove alleged, Defendants Caswell, Parent, Livingston Paglia and Schmidman failed to undertake the appropriate and necessary actions to reduce or eliminate the continuing debts and losses of CMPI and/or CenterStaging, including but not limited to bringing in disinterested, i.e. independent, directors onto the board of directors, terminating management personnel (including those officers who were board members and/or substantial shareholders of the company) who were not performing and/or bringing in new management or business consultants for purposes of reducing CMPI's (and/or CenterStaging's) overhead; obtaining a revenue(s) streams from the "rehearsals.com" assets, including but not

limited to the studios; and restructuring the "rehearsals.com" business model and if need be eliminating altogether the "rehearsals.com" division.

62. During a period of time between January 2007 and March 10, 2008, and during the time the Company was operating within the zone of insolvency and deepening insolvency, Defendants Caswell, Parent, Livingston and Paglia as the sole directors of the Company and the Company's senior officers:

    a. Caused or permitted CMPI and/or CSC to pay excessive expenses without an appropriate business purpose or reason;

    b. Caused or permitted CMPI and/or CSC to pay excessive salaries and other remuneration or consideration to the Company's directors and officers, including themselves;

    c. Failed to seek or achieve the means to generate revenue or sufficient revenue from CMPI's "rehearsals.com" division;

    d. Continued to use the so-called "HD studios" for recording of content for the so-called music video library tapes ("MVL"), thereby foregoing rental income or increased rental income for the HD studios;

    e. Failed, once collected, to have MVL processed (or timely processed) for purposes of maximizing its value, including the failure to edit the MVL;

    f. Failed to seek and / or obtain the approvals, releases, clearances and licenses from artists and other parties needed for using the MVL;

    g. Failed to enter into agreements that properly exploited the value of the MVL and/or failed to take steps to protect the value of the MVL for the benefit of the Company and its creditors;

    h. Allowed CMPI (and/or CSC) to engage and pay for contractors and consultants who were overpaid (or excessively overpaid) and/or were not required to (or did not) deliver sufficient value to the Company;

    i. Allowed the facilities of CMPI to be used without requiring sufficient payment or consideration of the same, including failing to enter into written leases for the studios;

25

1      j.  Allowed CMPI to operate with excessive costs, including excessive and unnecessary
2          payroll costs;
3      k.  Allowed CMPI (and/or CSC) to incur excessive debt, including in support of
4          obligations of its parent company.
5      l.  Cause CMPI (and/or CSC) not to pay approximately $1,000,000 in withholding
6          taxes, and that with penalties has resulted in approximately $2,000,000 obligation of
7          CMPI to the Internal Revenue Service and California Board of Equalization;
8      m. Failed to take steps necessary to restructure or close down the "rehearsals.com"
9          division once it became apparent that the business model did not work, as reflected
10         by its failure to generate revenue while being the major source of CMPI's losses;
11     n.  Caused the Company to wrongfully use the same assets of the Company as security
12         for loans made by more than one lender;
13     o.  Caused the Company to raise additional funds from one or more lenders based upon
14         representations that CMPI (and/or CSC) had entered into contracts that would have
15         resulted in significant income coming into CMPI for use of the HD studios,
16         including but not limited contracts with "Cinema Now, " AARP and Major League
17         Baseball, when no such contracts ever existed or came to fruition;
18     p.  Caused the Company to make repayments of loans to insiders during the period of
19         time the Company was in the zone of insolvency and in preference to the creditors
20         of the Company which payments are in excess of $700,000;
21     q.  Maintained CSC as a public company when the costs associated therewith were
22         excessive and caused an inappropriate depletion of the CMPI's assets;
23     r.  Failed to bring into the CMPI disinterested outside directors;
24     s.  Failed to exercise all rights under leases of real property with third parties and/or
25         prosecute the Company's leasehold rights effectively.
26     63.    As a result of their acts and conduct each of the  Defendants,  Caswell,  Parent,
27 Livingston, Paglia and Schmidman, breached their fiduciary duty to the Company and its
28 creditors.

64.    Defendants Caswell, Parent, Livingston, Paglia, and Schmidman have caused damages to the Company and the creditors of the CMPI in an amount as yet undetermined but in no event less than $13,000,000.

### THIRD CLAIM FOR RELIEF

**(FOR DECLARATORY RELIEF CHARACTERIZING THE DIRETORS' LOANS AGAINST DEFENDANTS CASWELL, PARENT, LIVINGSTON AND PAGLIA)**

65.    Plaintiff realleges paragraphs 1 through 64 of this Complaint as though fully set forth herein.

66.    As presented above, during 2006, the Company and Defendants Caswell, Parent, Livingston and Paglia entered into the LOCs.

67.    During 2006 and up until March 10, 2008, and from time to time, Defendants would advance money to the Company under the terms of the LOCs and the Company would repay, in all or in part the money advanced under the LOCs, as set forth in Exhibits "3" and "4" to this Complaint.

68.    An actual controversy exists between the Plaintiff and Defendants concerning the LOCs and the nature of the same.  Plaintiff contends that the LOCs and the advances made thereunder represent equity investments on the part of the Defendants as the Debtors' controlling shareholders, rather than loans.   Among the indicia that the Notes should properly be characterized as equity are: (a) the lack of a schedule for regular interest payments; (b) the Defendants failure to enforce its rights when the Debtor failed to pay all amounts due upon demand; (c) the continuing payments by the Defendants as and when the Company needed "cash flow" for operations; (d) the relatively minor amount of actual cash paid for by Defendants for their shares in the Company.

69.    By their actions in the operation of the Company's business, Defendants further demonstrated that the LOCs and the payments made thereunder represent equity investments and that the Defendants looked to the Debtor's future earnings as the source of repayment of their advances, including:  (a) by dominating and controlling the Debtor's management decisions; (b) by providing advances that exceeded by several times the acknowledged capital investment of

27

the Defendants; and (c) by continuing to advance funds while the Debtor was undercapitalized and in the deepening zone of insolvency.

70.  The Debtor's estate and creditors have been damaged by the making of the payments made and received under and pursuant to the LOCs (the "Transfers.")

71.  The Transfers were made with the intent and effect of replacing equity with unsecured insider debt.

72.  The Plaintiff has a right to declaratory relief pursuant to 11 U.S.C. § 105 confirming that the Transfers made by and received under and pursuant to the LOCs should be re-characterized as equity investments by the Defendants as the Debtor's controlling shareholder rather than debt. The Plaintiff is informed and believes that the Defendants contest this characterization.

## FOURTH CLAIM FOR RELIEF

### (FOR RECOVERY OF AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § § 547 and 550 AGAINST DEFENDANT LIVINGSTON)

73.  Plaintiff realleges paragraphs 1 through 72 of this Complaint as though fully set forth herein.

74.  Section 101(54) of the Code applicable to this case defines the term "transfer" as "(A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a debtor's equity of redemption; or (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property."

75.  Between March 10, 2007 and March 10, 2008, the Debtor made transfer(s) to Defendant Livingston totaling $ 472,100.00, as more fully set forth on Exhibits "3" and "4" (the "Preferential Transfers.")

76.  Each of the Preferential Transfers constituted a transfer of property of the Debtor to the Defendant, and that each of the Preferential Transfers constitutes a "transfer" within the meaning of Section 101 (154) of the Code, made within one year prior to the Petition Date.

28

77.     The Preferential Transfers were made to or for the benefit of the Defendant as a creditor of the Debtor.

78.     The Preferential Transfers were made for or on account of an antecedent debt owing by the Debtor to the Defendant before the Preferential Transfers were made.

79.     The Preferential Transfers were made while the Debtor was insolvent.

80.     The Preferential Transfers enabled the Defendant, as a creditor, to receive more than he would have received if the Transfers had not been made and instead he was to receive the payment on his claim only to the extent provided by Chapter 7 of the Code.

81.     By reasons of the foregoing, pursuant to Section 547(b) of the Code, Plaintiff may avoid the Preferential Transfers.

82.     Furthermore, pursuant to Section 550 of the Code, Plaintiff may recover from the Defendant the value of the property transferred under the Preferential Transfer, plus interest thereon at the maximum legal rate from and after the date of each of the Preferential Transfers, in a sum according to proof, which Plaintiff believes not to be less than $ $ 472,100.00.

## FIFTH CLAIM FOR RELIEF

### (FOR RECOVERY OF AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § § 547 and 550 AGAINST DEFENDANT PAGLIA)

83.     Plaintiff realleges paragraphs 1 through 72 of this Complaint as though fully set forth herein.

84.     Section 101(54) of the Code applicable to this case defines the term "transfer" as "(A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a debtor's equity of redemption; or (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property."

85.     Between March 10, 2007 and March 10, 2008, the Debtor made transfer(s) to Defendant Paglia totaling $ 238,500.00, as more fully set forth on Exhibits "3" and "4" (the "Preferential Transfers.")

86.     Each of the Preferential Transfers constituted a transfer of property of the Debtor to the Defendant, and that each of the Preferential Transfers constitutes a "transfer" within the meaning of Section 101 (154) of the Code, made within one year prior to the Petition Date.

87.     The Preferential Transfers were made to or for the benefit of the Defendant as a creditor of the Debtor.

88.     The Preferential Transfers were made for or on account of an antecedent debt owing by the Debtor to the Defendant before the Preferential Transfers were made.

89.     The Preferential Transfers were made while the Debtor was insolvent.

90.     The Preferential Transfers enabled the Defendant, as a creditor, to receive more than he would have received if the Transfers had not been made and instead he was to receive the payment on his claim only to the extent provided by Chapter 7 of the Code.

91.     By reasons of the foregoing, pursuant to Section 547(b) of the Code, Plaintiff may avoid the Preferential Transfers.

92.     Furthermore, pursuant to Section 550 of the Code, Plaintiff may recover from the Defendant the value of the property transferred under the Preferential Transfer, plus interest thereon at the maximum legal rate from and after the date of each of the Preferential Transfers, in a sum according to proof, which Plaintiff believes not to be less than $ 238,500.00.

### SIXTH CLAIM FOR RELIEF

**(FOR RECOVERY OF AVOIDED TRANSFERS
PURSUANT TO 11 U.S.C. § § 547 and 550
AGAINST DEFENDANT SCHMIDMAN)**

93.     Plaintiff realleges paragraphs 1 through 72 of this Complaint as though fully set forth herein.

94.     Section 101(54) of the Code applicable to this case defines the term "transfer" as "(A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a debtor's equity of redemption; or (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property."

95. Between March 10, 2007 and March 10, 2008, the Debtor made transfer(s) to Defendant Schmidman totaling $ 6,000.00, as more fully set forth on Exhibits "3" and "4" (the "Preferential Transfers.")

96. Each of the Preferential Transfers constituted a transfer of property of the Debtor to the Defendant, and that each of the Preferential Transfers constitutes a "transfer" within the meaning of Section 101 (154) of the Code, made within one year prior to the Petition Date.

97. The Preferential Transfers were made to or for the benefit of the Defendant as a creditor of the Debtor.

98. The Preferential Transfers were made for or on account of an antecedent debt owing by the Debtor to the Defendant before the Preferential Transfers were made.

99. The Preferential Transfers were made while the Debtor was insolvent.

100. The Preferential Transfers enabled the Defendant, as a creditor, to receive more than he would have received if the Transfers had not been made and instead he was to receive the payment on his claim only to the extent provided by Chapter 7 of the Code.

101. By reasons of the foregoing, pursuant to Section 547(b) of the Code, Plaintiff may avoid the Preferential Transfers.

102. Furthermore, pursuant to Section 550 of the Code, Plaintiff may recover from the Defendant the value of the property transferred under the Preferential Transfer, plus interest thereon at the maximum legal rate from and after the date of each of the Preferential Transfers, in a sum according to proof, which Plaintiff believes not to be less than $ 6,000.00.

### SEVENTH CLAIM FOR RELIEF

**(TO AVOID AND RECOVER FRAUDULENT TRANSFERS, ACTUAL INTENT AS AGAINST DEFENDANTS LIVINGSTON, PAGLIA, AND SCHMIDMAN, PURSUANT TO 11 U.S.C. § 544 (b) AND CALIFORNIA CIVIL CODE § 3439.04(a) (1))**

103. Plaintiff realleges paragraphs 1 through 102 of this Complaint as though fully set forth herein.

104. Between 2005 and March 10, 2008, the Company made transfers to the Defendant Paglia in the amount of $ 298,000.00, to Defendant Livingston in the amount of $ 567,536.00 and to Defendant Schmidman in the amount of $6,000.00. The Transfers to each of the Defendants as set forth above constitute fraudulent conveyances, the payments of which were

1   authorized by the Defendants and each of them and were made with the actual intent to hinder,

2   delay, or defraud the Debtor's creditors.

3       105.    Interest on the Fraudulent Transfers has accrued and continues to accrue from the

4   date that the Fraudulent Transfers were made.

5       106.    The Fraudulent Transfers and each of them, are avoidable pursuant to 11 U.S.C.

6   §§ 544, 548(a)(1)(A) and/or 548(a)(1)(B) and Cal. Civ. § § 3439.04(a)(1), 3439.04(a)(2) and

7   3439.05.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF prays for judgment as follows:

### **On the First Claim for Relief**

1.    For judgment against the Defendants Caswell, Parent, Livingston, Paglia and Schmidman for breach of fiduciary duty damages in an amount to be determined at the time of trial but believed to be in excess of $13 million.

### **On the Second Claim for Relief**

2.    For judgment against the Defendants Caswell, Parent, Livingston, Paglia and Schmidman for breach of fiduciary duty damages in an amount to be determined at the time of trial but believed to be in excess of $13 million.

### **On the Third Claim for Relief**

3.    For judgment against the Defendants Caswell, Parent, Livingston, and Paglia declaratory relief that the Transfers made by the Defendants should be characterized as equity rather than as loan obligations.

### **On the Fourth Claim for Relief**

4.    For judgment against the Defendant Livingston for avoiding the Transfers pursuant to 11 U.S.C. § 547 and 550 of the Code and for damages in an amount according to proof.

///

///

1 **On the Fifth Claim for Relief**

2     5.    For judgment against the Defendant Paglia for avoiding the Transfers pursuant to

3 11 U.S.C. § 547 and 550 of the Code and for damages in an amount according to proof.

4 **On the Sixth Claim for Relief**

5     6.    For judgment against the Defendant Schmidman for avoiding the Transfers

6 pursuant to 11 U.S.C. § 547 and 550 of the Code and for damages in an amount according to

7 proof.

8 **On the Seventh Claim for Relief**

9     7.    For judgment against the Defendants Livingston, Paglia and Schmidman to avoid

10 and recover fraudulent transfers, actual intent, pursuant to 11 U.S.C. § 544(b) and California

11 Civil Code § 3439.04(a) and for damages in an amount according to proof.

12 **On All Claims for Relief**

13     8.    For costs of suit incurred herein.

14     9.    For attorney fees and costs;

15     10.    For such other and further relief as the Court deems just and proper.

16                           **JURY DEMAND**

17     Plaintiff hereby requests a trial by jury.

18

19 Dated: June 26, 2009                LARRY W. GABRIEL
DANIEL J. MULLIGAN

20                               JENKINS, MULLIGAN & GABRIEL, L.L.P.

21

22                               By_____

23                                     Larry W. Gabriel

24                               Attorneys for David Gould, Chapter 11
Examiner Of Centerstaging Musical

25                               Corporation, Inc., Debtor

26

27

28

# REVOLVING LINE OF CREDIT AGREEMENT

This Revolving Line of Credit Agreement (this "Agreement") is made as of July 1, 2006 by and between CenterStaging Corp., a Delaware corporation ("Borrower"), and Howard Livingston ("Lender"), with reference to the following facts.

A.     Borrower may be in need of funds from time to time to meet its short-term working capital requirements.

B.     On the terms and subject to the conditions set forth in this Agreement, Lender, in its discretion, is willing to make funds available to Borrower on a revolving basis in order to meet such working capital needs.

## AGREEMENT

1.     **Advances**

1.1     At Borrower's request, Lender, in its sole and absolute discretion, may advance funds to Borrower, in which event Borrower agrees to repay such advances, from time to time in accordance with the terms and conditions of this Agreement and the form of revolving promissory note attached hereto as Exhibit A (the "Note"); provided, however, that at no time shall the aggregate of all advances outstanding under this Agreement and the Note at any time exceed $250,000.

1.2     This Agreement shall expire two years after the date of this Agreement; provided, however, that this Agreement may be terminated sooner upon notice from Lender to Borrower at any time.

2.     **Miscellaneous Provisions**

2.1     Notices.  All notices, requests, demands and other communications given pursuant to this Agreement or the Note shall be in writing, and shall be delivered by personal service, courier, facsimile transmission or by United States first class, registered or certified mail, addressed to the following addresses:

    If to Borrower:     CenterStaging Corp.
                        3407 Winona Avenue
                        Burbank, California 91504
                        Attention: Chief Executive Officer
                        Facsimile: (818) 848-4016

    If to Lender:       Howard Livingston
                        c/o CenterStaging Corp.
                        3407 Winona Avenue
                        Burbank, California 91504
                        Facsimile: (818) 848-4016

# EXHIBIT 1

Any such notice, other than a notice sent by registered or certified mail, shall be effective when received; a notice sent by registered or certified mail, postage prepaid return receipt requested, shall be effective on the earlier of when received or the third day following deposit in the United States mails (or on the seventh day if sent to or from an address outside the United States). Any party may from time to time change its address for further notices hereunder by giving notice to the other party in the manner prescribed in this Section.

2.2     No Waivers; Remedies Cumulative. No failure or delay by a party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided herein shall be cumulative and not exclusive of any rights or remedies provided by law.

2.3     Amendments and Waivers. Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by Borrower and Lender and such amendment is approved by the Board of Directors of Borrower.

2.4     Successors and Assigns. Borrower may not assign its right or duties hereunder without the prior written consent of Lender, which consent Lender may deny, withhold or delay in its sole and absolute discretion.

2.5     Governing Law. This Agreement has been made and entered into in the State of California and shall be construed in accordance with the laws of the State of California without giving effect to the principles of conflicts of law thereof.

2.6     Prior Understandings. This Agreement supersedes all prior understandings and agreements (whether written, oral or otherwise) pertaining to the subject matter hereof, and constitutes the entire agreement between the parties hereto relating to the subject matter hereof and the transactions provided for herein.

2.7     Counterparts. This Agreement may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same agreement with the same effect as if all parties had signed the same signature page. The parties shall accept facsimile signatures as the equivalent of original ones.

2.8     Severability. If any provision of this Agreement or the application of such provision to any Person or circumstance will be held invalid, the remainder of this Agreement or the application of such provision to Persons or circumstances other than those to which it is held invalid will not be affected thereby.

2.9     Additional Documents and Acts. Borrower shall execute and deliver such additional documents and instruments and shall perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated by this Agreement.

2.10    Survival. All indemnities, rights, remedies, representations and warranties contained herein shall survive the expiration or termination of this Agreement, and no

termination or expiration hereof shall relieve either party from liability for any breach of this Agreement.

    IN WITNESS WHEREOF, the parties have executed and delivered this Agreement to one another as of the date first above written.

LENDER:

_____

Howard Livingston

BORROWER:

CENTERSTAGING CORP.

By: _____

Roger Paglia, Chief Executive Officer